UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

JOHN TATUM      CIVIL ACTION NO. 6:18-cv-01648

VERSUS        MAGISTRATE JUDGE HANNA

U.S. COMMISSIONER,    BY CONSENT OF THE PARTIES
SOCIAL SECURITY
ADMINISTRATION

## MEMORANDUM RULING

Before the Court is an appeal of the Commissioner's finding of non-disability. In accordance with the provisions of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties consented to have this matter resolved by the undersigned Magistrate Judge (Rec. Doc. 9-1), and the matter was referred to this Court for resolution (Rec. Doc. 10). Considering the administrative record, the briefs of the parties, and the applicable law, the Commissioner's decision is reversed and remanded for further administrative action.

## Administrative Proceedings

The claimant, John Tatum, fully exhausted his administrative remedies before filing this action. He filed applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"), alleging disability beginning on July

1, 2013.[1]  His applications were denied.[2]  He requested a hearing, which was held on October 11, 2017 before Administrative Law Judge Lawrence T. Ragona.[3]  The ALJ issued a decision on February 7, 2018, concluding that the claimant was not disabled within the meaning of the Social Security Act from July 1, 2013 through the date of the decision.[4]  The claimant asked the Appeals Council to review the ALJ's decision, but the Appeal Council found no basis for review.[5]  Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review.[6]  The claimant then initiated this action, seeking judicial review of the Commissioner's decision.

## Summary of Pertinent Facts

The claimant was born on September 29, 1969.[7]  At the time of the ALJ's decision, he was 48 years old.  He has a tenth grade education[8] and work experience

---

[1]     Rec. Doc. 7-1 at 214, 221.

[2]     Rec. Doc. 7-1 at 109, 110.

[3]     A transcript of the hearing is found in the record at Rec. Doc. 7-1 at 43-64.

[4]     Rec. Doc. 7-1 at 21-34.

[5]     Rec. Doc. 7-1 at 7.

[6]     *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[7]     Rec. Doc. 7-1 at 44.

[8]     Rec. Doc. 7-1 at 46, 256.

on a drilling crew in the oil and gas industry.[9]  He alleged that he has been disabled since July 1, 2013[10] due to bad knees, a shoulder that pops out of socket, and a right ankle that rolls and causes him to fall.[11]

On July 20, 2010, Mr. Tatum visited the emergency room at St. Martin Hospital in Breaux Bridge, Louisiana, complaining of pain in his left foot and toes.[12] He explained that he had stubbed his toe after his left knee gave out.  He was diagnosed with a nondisplaced fracture of the proximal left fifth toe, given Demerol and Phenergan, placed in a foot/toe brace, and discharged.

On September 30, 2011, the claimant was again seen in the emergency room at St. Martin Hospital.[13]  He gave a history of left knee problems and stated that he had felt something pop behind his left knee.  X-rays showed a prior anterior cruciate ligament ("ACL") repair of the left knee and a large joint space effusion without evidence of fracture.  The radiologist indicated that there might be a recurrent ACL injury.  The claimant was given Toradol and Flexeril, his knee was placed in a brace,

---

[9]      Rec. Doc. 7-1 at 48, 256, 271.

[10]      Rec. Doc. 7-1 at 214, 221, 255.

[11]      Rec. Doc. 7-1 at 255.

[12]      Rec. Doc. 7-2 at 130-135.

[13]      Rec. Doc. 7-2 at 118-123.

and he was discharged with crutches. The diagnosis was left knee pain and contusion. He was instructed to follow up with his primary care physician.

The claimant was again seen in the emergency room at St. Martin Hospital a month later, on October 20, 2011, complaining of right ankle pain that started after a fall.[14] X-rays showed no evidence of a fracture but there was prominent lateral soft tissue swelling. The claimant left without seeing the doctor.

The claimant returned to the emergency room at St. Martin Hospital on July 3, 2013,[15] complaining of left knee pain and swelling as well as left hip pain that had started two to three days earlier without any trauma or heavy lifting. He rated his pain at eight out of ten. He reported having had prior surgery on his left knee and stated that it sometimes locked up or gave out. X-rays of his knee showed moderate hypertrophic spurring, joint space narrowing laterally, and joint effusion but no fracture or dislocation. He was diagnosed with degenerative joint disease and internal derangement of the knee. He was given a Toradol injection and a Norco pill, prescribed Vicodin, and advised to follow up in the orthopedics clinic at University Medical Center in Lafayette, Louisiana.

---

[14]     Rec. Doc. 7-2 at 114-117.

[15]     Rec. Doc. 7-2 at 185-221.

4

On July 25, 2013, the claimant was seen in the orthopedics clinic at University Hospital and Clinics ("UHC") in Lafayette, Louisiana.[16]  He complained of severe pain in his left knee that he rated at ten out of ten.  He reported surgical repair of his left ACL in 2008 and stated that he could not work because his left knee gave out on him when lifting.  X-rays showed advanced femorotibial and mild to moderate patellofemoral degenerative arthrosis with several osteochondral bodies in the joint. His knee was injected with Lidocaine and Kenalog.

On August 13, 2013, the claimant again visited the emergency room at St. Martin Hospital,[17] complaining of left knee pain that he rated at nine out of ten.  He reported that he had fallen the day before, that his pain worsened with movement and walking, and that his pain was relieved by immobilization of his knee.  X-rays showed surgical changes from the previous ACL repair, moderate degenerative osteoarthritic changes, and a small joint effusion.  He was diagnosed with a knee sprain, given injections of Dilaudid and Toradol, advised to limit his activity, and instructed to follow up with an orthopedic surgeon.  He was prescribed Norco and Naproxen, and a knee immobilizer was applied.

---

[16]     This facility was previously referred to as University Medical Center.

[17]     Rec. Doc. 7-2 at 222-259.

On January 18, 2014, the claimant was seen in the emergency room at UHC, complaining of left knee pain following a fall that morning.[18] He reported that he had been lifting a generator when he slipped, and his left knee went out to the side. He rated his pain at six out of ten. He also reported the prior knee surgery. It was noted that his gait was limited by pain and that he was unable to bear weight on his left leg. There was tenderness, swelling, a limited range of motion, and laxity in his knee. X-rays showed femorotibial degenerative change, postsurgical change suggestive of prior ACL repair, loose joint body laterally, and mild chondrocalcinosis.[19] He was diagnosed with left knee trauma/strain. His knee was immobilized, he was instructed to use crutches and not put weight on his left knee, and Norco was prescribed. He was to follow up at the UHC orthopedics clinic.

On March 17, 2014, the claimant was seen in the emergency room at UHC at approximately 1:30 in the afternoon.[20] He reported that he had fallen backwards down six stairs and landed on his hip, hitting his head but not losing consciousness. He also reported that he had bad knees that gave out as well as a history of degenerative joint disease in both knees. He rated his pain at ten out of ten. He arrived in the triage area on crutches but stated that he could not stand up anymore

---

[18]     Rec. Doc. 7-2 at 33-39, 281-312.

[19]     Rec. Doc. 7-2 at 22-23.

[20]     Rec. Doc. 7-2 at 9-32.

and was put on a stretcher.  X-rays of his back showed multilevel spondylosis and multilevel discogenic degenerative changes.  X-rays of his left knee showed no displaced fracture or subluxation, postsurgical changes including ACL reconstruction, mild to moderate degenerative changes, persistent small joint effusion, secondary osteochondromatosis and fabella, and possible meniscal ossicle laterally.  X-rays of his hips and pelvis showed no acute osseous pathology.  He was prescribed Cyclobenzaprine HCI and Ultram.

At approximately 5:00 that same afternoon, he presented in the emergency room at St. Martin Hospital.[21]  He reported that he had fallen off the top of a set of stairs and landed on concrete at about 10:30 that morning.  He complained of left hip and left knee pain.  He gave a history of knee problems and was walking on crutches.  He rated his pain at ten out of ten and stated that he was better standing than sitting.  He was cooperative but crying.  Examination showed mild swelling and tenderness in his knee and hip.  X-rays of his hip showed no acute fractures or subluxations.  X-rays of his left knee showed no fractures or subluxations, but a suprapatellar joint effusion.   It was noted that there were changes from tricompartment osteoarthritis and postsurgical changes that were stable in

---

[21]      Rec. Doc. 7-2 at 281-312.

appearance from the previous x-ray examination. He was diagnosed with contusions of hip and knee. He was prescribed Norco and Naproxen.

The claimant was again seen in the emergency room at St. Martin Hospital on July 25, 2014.[22] He gave a history of chronic knee pain with two prior surgeries and reported that his left knee had buckled twice that day, leaving him with severe pain that he rated at nine out of ten. He reported that the pain was worsened with movement, transfer, weight bearing, and walking. Examination showed the left knee was tender especially posteriorly but with no effusion or joint laxity and with pain on movement. He was prescribed Norco and Naprosyn. He was counseled to stop smoking. The claimant left the hospital against medical advice while waiting for an x-ray to be taken, stating that he just wanted some pain medication.

On January 22, 2015, the claimant returned to the emergency room at St. Martin Hospital,[23] complaining of right shoulder pain. He reported that he had injured his shoulder the day before while lifting something heavy at work and suspected that it might be dislocated. He rated the pain at ten out of ten, which was worsened with palpation and movement. He had not slept and was very sleepy and weak as well as nauseated with a cough and chest congestion. X-rays of his shoulder showed no fracture, dislocation, or intrinsic osseous lesion, and the surrounding soft

---

[22]      Rec. Doc. 7-2 at 260-280.

[23]      Rec. Doc. 7-2 at 313-342.

tissues were within normal limits. He was diagnosed with contusion, sprain, rotator cuff injury, strain. He was given a Zofran tablet and a Toradol injection. He was prescribed Norco and Naproxen.

The claimant was seen in the emergency room at Iberia Medical Center on March 25, 2015, complaining of right knee pain.[24] He was given a right knee immobilizer and diagnosed with internal derangement of the right knee.

On April 2, 2015, the claimant was seen in the orthopedic clinic at UHC for right knee pain. He reported that he had stepped on a tree root on March 25, 2015 and twisted his knee, which resulted in swelling, pain, and instability of his knee. He had been taking Norco for pain with moderate relief but had run out. He denied numbness or tingling in his right leg. He had been seen in the emergency room and referred to the orthopedic clinic. His knee was immobilized and he was using crutches. Examination revealed a limited range of motion due to pain. X-rays taken on March 25 showed no osseous abnormalities but a probable suprapatellar effusion in the right knee. The plan was aspiration of right knee effusion, gentle range of motion exercises, a Norco prescription for pain relief, a hinged knee brace to stabilize the knee, and another visit in two weeks to discuss a possible MRI and treatment options.

---

[24]      Rec. Doc. 7-2 at 92-94.

The claimant returned to UHC on April 15, 2015.[25]  He complained of right knee pain and a decreased range of motion.  X-rays of the right knee showed a probable nondisplaced fibular head fracture and a small avulsive injury of the posterior aspect of the fibular head with significant joint effusion and soft tissue swelling.  An MRI of the right knee showed bone contusions of the lateral femoral condyle and lateral tibial plateau, marrow edema of the proximal fibula with questionable nondisplaced fibular head fracture, and associated tear of the lateral collateral ligament complex, a complex tear of the posterior horn of the medial meniscus, an ACL tear, and chondromalacia with underlying subcortical marrow edema involving the medial patellar facet and medial femoral trochlea.  The claimant was instructed on how to regain motion in his knee.  He was to return in two weeks.

The claimant followed up at UHC on August 3, 2015,[26] reporting that while under instructions to bear weight as tolerated and mowing his lawn, he had reinjured his knee and was no longer able to bear weight on his right leg.  On examination, he had a positive Lachman's test.  He was instructed not to bear weight on his right leg, to use a hinged knee brace, and to return for further evaluation of surgical versus nonsurgical treatment options.  He was prescribed Percocet.

---

[25]     Rec. Doc. 7-2 at 2-4.

[26]     Rec. Doc. 7-2 at 67-74.

The claimant was again seen in the orthopedic clinic at UHC on October 28, 2015, complaining of bilateral knee pain.[27]  He reported that his right knee was unstable and gave way daily.  He had not had physical therapy for his right knee.  He reported that his left knee was painful daily, worsened with activity, and unstable.  X-rays showed significant post-surgical and degenerative changes in the claimant's left knee without evidence of an acute abnormality and no acute abnormality of the right knee.  The claimant reported having instability in the left knee since the earlier surgery, but he had not had injections or physical therapy.  Lachman's test was positive in both knees.  The doctor noted an ACL tear on the right.  He was going to discuss the case with another doctor and then perhaps offer ACL reconstruction surgery.  However, the claimant would have to stop smoking before that surgery.  The claimant was instructed to continue wearing bilateral knee sleeves.  With regard to the left knee, it was noted that he would likely need a total knee replacement in the future.  No narcotics were prescribed, as the claimant reported that Norco and Naprosyn did not help his pain.

On November 12, 2015, the claimant presented in the emergency room at Iberia Medical Center.[28]  He reported that he had injured his right knee when he tripped over a dog.  He also reported that he was scheduled to have surgery on that

---

[27]     Rec. Doc. 7-2 at 60-66.

[28]     Rec. Doc. 7-2 at 96-99.

11

knee in the near future. X-rays showed no fracture, dislocation, or suspicious bony lesions. He was diagnosed with internal derangement of the knee.

The claimant was seen at the orthopedic clinic at UHC on December 14, 2015.[29] He was on a wait list for right ACL reconstruction and wanted to know when he could have the surgery. He complained of pain and instability in both knees. The doctor acknowledged that the claimant had a complete tear of his right ACL but explained that he was not a candidate for right ACL reconstruction because he was a smoker. The importance of smoking cessation was discussed. The claimant was also advised to work on strengthening his quadriceps muscles.

The claimant was seen in the emergency room at St. Martin hospital on May 11, 2016.[30] He complained of chronic right knee pain, stated that he was scheduled for surgery in June, and had twisted his knee the evening before, worsening the pain. He estimated his pain at ten out of ten and was using crutches. On examination, it was noted that his right knee was tender but not swollen. He was diagnosed with a sprain of the superior tibiofibular joint and ligament of the right knee. He was given an injection of Toradol, an injection of Dexametasone, and an injection of Lidocaine. He was prescribed Toradol and Prednisone.

---

[29]     Rec. Doc. 7-2 at 53-59.

[30]     Rec. Doc. 7-2 at 343-373.

On July 25, 2016, the claimant saw Dr. Christine Stairs and Dr. Michael Britt at University Health-Shreveport's orthopedics clinic for bilateral knee pain.[31]  X-rays showed evidence of a prior left ACL reconstruction, degenerative changes left greater than right, and bilateral joint effusions.  He reported that his left knee pain started in 2010 when he fell at work and sustained a complete ACL tear with a meniscus tear, which was repaired in Baton Rouge in 2010.  He reported that he underwent physical therapy thereafter.  He stated that due to compensating for his left knee pain after the surgery, he sustained an ACL tear of his right knee about two to three years later when he tripped over his dog.  He did not have surgery on the right knee, stating that the clinic where he was seen had shut down.  It was noted that the claimant walked with a limp, wore braces on both knees at all times due to instability, and usually walked without assistive devices, but had a cane and crutches that he could use when necessary.  He was not taking any medication for pain relief.  Examination of the left knee showed diffuse tenderness to palpation over the medial and lateral joint line and the patellofemoral joint; pain with flexion and extension of the knee; no laxity on varus or valgus stress; negative Lachman's test; and positive McMurray's test.  Examination of the right knee showed no joint effusion, positive Lachman's test; pain with McMurray's test; tenderness to palpation over the medial

---

[31]     Rec. Doc. 7-2 at 103-113.

and lateral joint line and patellofemoral joint; and no crepitus on flexion or extension. He was given prescriptions for physical therapy and for Voltaren gel to use on both knees. He was to follow up in three months and bring the CDs containing his prior MRI images with him.

On December 5, 2016, the claimant was seen in the emergency room at St. Martin Hospital.[32] He complained of suicidal ideation, homicidal ideation, audio and visual hallucinations, severe depression, anxiety, and paranoia. He was not sleeping, was drinking alcohol, and stated that he needed help. He reported that his symptoms had started about a week earlier and were worsening, exacerbated by family and financial problems. He was tearful and cooperative. He was given Benadryl, Geodon (an antipsychotic medication), Lorazepam (which treats anxiety disorders), and a Nicoderm patch. He was then transferred to Greenbrier Hospital.

The claimant received in-patient treatment at Greenbrier Hospital in Covington, Louisiana, from December 5 through 10, 2016[33] following admission on a physician's emergency certificate ("PEC"). He reported having had escalating trouble with new neighbors. A drug screen was positive for marijuana. He reported a previous inpatient hospitalization and a previous suicide attempt along with a history of PTSD from military service. He had also been a smoke jumper with the

---

[32]     Rec. Doc. 7-3 at 2-59.

[33]     Rec. Doc. 7-3 at 60-73.

fire department and was having hallucinations or nightmares related to seeing the faces of burn victims. He also reported a traumatic childhood with an abusive stepfather. He was very anxious, irritable, and verbally aggressive upon admission but soon became compliant with medications and cooperative. After a couple of days, he had a grand mal seizure. Then he had several more seizures over the next few days. He was started on Dilantin. He admitted having had a seizure disorder in the past, but he had not had a seizure in over twenty-five years; consequently, he was not taking any medication for that condition. Upon discharge, the claimant had not had a seizure in more than twenty-four hours. The primary diagnosis was major depressive disorder, recurrent, severe, with suicidal and homicidal ideation but no psychotic features. The prognosis was guarded. While in the hospital, the claimant used a wheelchair, partly because of his knees and partly for his own protection in case of a seizure. He was prescribed Depakote, Prozac, Ativan, Prazosin, and Dilantin. He was to follow up with sobriety counseling, mental health treatment, and with a neurologist for his seizure disorder.

On February 6, 2017, the claimant was seen in the outpatient clinic at University Health-Shreveport, following up with regard to his knees.[34] He reported that his knee pain was progressively worsening and waking him up at night, with his

---

[34]     Rec. Doc. 7-3 at 74-76.

right knee worse than the left. He had used canes, crutches, and braces. He reported that the hardest thing for him to do was to walk or use stairs. He reported that his knees buckled, causing him to fall. He reported swelling in both knees. He reported having taken Norco for pain until the clinic in Lafayette closed. He had tried Aleve and Ibuprofen without relief. Examination of the right knee showed the claimant to be very guarded. There was tenderness to palpation diffusely, a positive patella apprehension, pain with range of motion, positive Lachman's test and positive McMurry's test, positive Stinchfield's test at the lateral aspect of the hip as well as referred pain into the knee, and negative anterior and posterior drawer tests. Examination of the left knee showed evidence of previous surgery, joint effusion, tenderness to palpation over the medial aspect of the knee, negative patellar apprehension, negative Lachman's test, negative Stinchfield test, and negative anterior and posterior drawer test. Imaging showed medial joint space narrowing with osteoarthritic changes in the left knee and mild degenerative changes of the medical aspect of the right knee. He did not bring his prior MRI in for review. Surgical options were discussed but it was decided that physical therapy for both knees would be tried, and an additional MRI was ordered.

An MRI of the claimant's right knee was obtained at St. Martin Hospital on March 16, 2017.[35] The radiologist's impressions were chronic complete tear of the ACL; altered signal and irregularity in the posterior horn and body of the medial meniscus; tears in the anterior and posterior horns of the lateral meniscus; and areas of high-grade chondral loss in the medial femorotibial compartment.

The claimant returned to University Health-Shreveport on March 24, 2017,[36] reporting continued pain in his knees. It was noted that he normally walked with assistive devices, walked with a limp, had a cane and crutches, and wore braces on both knees due to instability. Examination of his right leg showed no effusion; tenderness to palpation over his medial and his lateral joint line; positive anterior drawer sign; positive Lachman's test; no laxity with varus or valgus stress; pain with McMurray's test; no locking or catching with flexion or extension; 2+ dorsalis pedis pulses; 5/5 strength with flexion and extension of his toes and ankle; and 4/5 strength with flexion and extension of his knees. The claimant brought in the MRI results for his right knee, which showed a lateral meniscus tear and a complete disruption of the ACL. Previous x-rays of his left knee showed arthritis in the left knee. A meniscal debridement procedure of the right knee was scheduled for April 11, 2017.

---

[35]     Rec. Doc. 7-3 at 158-160.

[36]     Rec. Doc. 7-3 at 77-79.

On April 11, 2017, right knee arthroscopy was performed, with medial and lateral meniscal debridement and medial and lateral compartment chondroplasty by Drs. Michael Britt and Andreas Chen at University Health-Shreveport.[37] The preoperative diagnosis was a complex tear of the medial meniscus on the lateral side of the right knee. The postoperative diagnoses were: complex tear of the medial meniscus on the lateral side of the right knee, ACL tear, Grade 4 chondromalacia of the medial compartment, Grade 3 chondromalacia of the lateral compartment, and significant synovial proliferation in the medial meniscus.

The claimant followed up at University Health-Shreveport on April 21, 2017.[38] His knee was still swollen but improving. His pain was somewhat improved although he was still having pain with knee flexion. He was walking without assistive devices about an hour per day. He was experiencing improvement in medial and lateral stability but still sensed anterior posterior instability. However, he had had no episodes of his leg giving way. He was to rest his leg to allow for healing and reduce swelling and also apply ice to reduce swelling. A Supartz injection series was ordered, to begin in one month.

---

[37]     Rec. Doc. 7-3 at 80-84.

[38]     Rec. Doc. 7-3 at 85-86.

The claimant again followed up on May 22, 2017.[39]  He was continuing to have knee pain that was keeping him up at night.  He had tried over-the-counter anti-inflammatories as well as Icy Hot, rest, ice, warm compresses, and elevation without relief.  He had only had two physical therapy sessions so far, and his insurer would not approve the Supartz injections until physical therapy was completed.  He was to bear weight on his leg as tolerated, continue physical therapy, and use over-the-counter medications for pain as needed.  He was to return in a month with x-rays.

The claimant had physical therapy at St. Martin Hospital[40] then followed up with Dr. Stairs at University Health-Shreveport on July 21, 2017.[41]  He complained of sharp pain to the medial side of his right knee with weight bearing, flexion, and extension.  He was mobile with a cane but did not have his cane with him that day.  He had an antalgic gait and was managing his pain with Ibuprofen.  The diagnoses were arthritis and primary osteoarthritis of the right knee.  Upon examination, there was tenderness to palpation over the medial side of the knee, passive range of motion was accompanied by significant pain; active range of motion was limited due to pain, there was no palpable knee effusion, strength was 5/5 with flexion and extension of the toes and ankle, strength was 4/5 with flexion and extension of his knee secondary

---

[39]     Rec. Doc. 7-3 at 86-89.

[40]     Rec. Doc. 7-3 at 161-253.

[41]     Rec. Doc. 7-3 at 94-97.

to pain. The knee was injected with Depo-Medrol and Marcaine. Dr. Britt explained that total knee arthroscopy was not indicated because it would cause further long term complications. The plan was to maximize current function of the knee and manage pain with injections and over-the-counter non-steroidal anti-inflammatory drugs. X-rays showed degenerative changes most prominently involving the medial joint space as well as right knee joint effusion.

On that same day, Dr. Stairs wrote a letter on behalf of Dr. Britt, [42] stating that the claimant "should be considered disabled due to his current level of pain and limitations in function." She stated that his swelling was diminished but he had severe medial joint line tenderness, x-rays showed progression of his degenerative changes, he was recommended for Supartz injections that were not approved by Medicaid, and "at this time he is not functionally able to work." She opined that he might be able to return to light duty in the future but he "will likely not be able to return to work within the next year."

On October 11, 2017, the claimant testified at a hearing regarding his symptoms and medical treatment. He explained that he had received injections in his knee that did not help. He testified that he needs to have complete knee replacements but cannot have it done until he is sixty years old. He stated that he

---

[42]     Rec. Doc. 7-3 at 93.

sees a doctor at UMC in Shreveport every month, does strengthening exercises every day, and uses cold and hot packs on his knees every day. He testified that he can sit comfortably for about half an hour before his legs and tailbone go numb due to a pinched nerve, and he needs to walk around. He also stated that surgery is not an option for that condition due to the likelihood of resulting paralysis. He stated that he can walk only short distances. Although he lives alone, his girlfriend does his grocery shopping, cooks for him, cleans his house, and does his laundry. His driver's license was revoked due to unpaid child support. He was using a cane on the day of the hearing, and he testified that he had used a cane every day for about two years. He allowed, however, that he sometimes did not use a cane on good days. He explained that his doctors told him that smoking would impede the healing process if he had surgery for his knees, and he had cut back on his smoking to about two packs per week.

The claimant now seeks reversal of the Commissioner's adverse ruling.

## Analysis

**A.** **Standard of Review**

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the

proper legal standards were used in evaluating the evidence.[43] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[44] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[45]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[46] In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[47] Conflicts in the evidence[48] and credibility assessments[49] are for the Commissioner to resolve, not the courts. Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective

---

[43]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[44]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[45]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[46]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[47]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[48]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[49]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[50]

## B.   Entitlement to Benefits

The DIB program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[51] The SSI program provides income to disabled individuals who meet certain income and resource requirements and have applied for benefits.[52]

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[53] A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such

---

[50]    *Wren v. Sullivan*, 925 F.2d at 126.

[51]    See 42 U.S.C. § 423(a). See, also, *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019).

[52]    42 U.S.C. § 1382(a)(1) & (2). See, also, *Smith v. Berryhill*, 139 S.Ct. at 1772.

[53]    42 U.S.C. § 1382c(a)(3)(A).

work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[54]

## C.   __Evaluation Process and Burden of Proof__

A sequential five-step inquiry is used to determine whether a claimant is disabled.  This process requires the Commissioner to evaluate whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[55]  Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[56] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[57]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[58]

---

[54]     42 U.S.C. § 1382c(a)(3)(B).

[55]     20 C.F.R. § 404.1520.

[56]     20 C.F.R. § 404.1520(a)(4).

[57]     20 C.F.R. § 404.1545(a)(1).

[58]     20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[59] This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[60] If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[61] If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[62]

## D.     The ALJ's Findings and Conclusions

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since July 1, 2013.[63] This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  spine disorder, degenerative joint disease status post left knee anterior

---

[59]     *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[60]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[61]     *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[62]     *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[63]     Rec. Doc. 7-1 at 24.

cruciate ligament medial meniscus repair, and anterior cruciate ligament and meniscus tear of the right knee.[64] This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[65] The claimant did not challenge this finding, but it will be discussed in greater detail, below.

The ALJ found that the claimant has the residual functional capacity to perform the full range of sedentary work.[66] The claimant challenged this finding.

At step four, the ALJ found that the claimant is not capable of performing any past relevant work.[67] The claimant did not challenge this finding.

At step five, the ALJ found that the claimant was not disabled from July 1, 2013 through the February 7, 2018 because the Medical-Vocational Rules support a finding of "not disabled."[68] The claimant challenged this finding.

---

[64]    Rec. Doc. 7-1 at 24.

[65]    Rec. Doc. 7-1 at 29.

[66]    Rec. Doc. 7-1 at 30.

[67]    Rec. Doc. 7-1 at 33.

[68]    Rec. Doc. 7-1 at 33-34.

### E.    The Allegations of Error

The claimant contends that the ALJ erred in failing to apply controlling law in evaluating the opinions of Dr. Christine Stairs and Dr. Michael Britt and in evaluating the claimant's residual functional capacity.

### F.    The ALJ's Evaluation of Dr. Stairs's and Dr. Britt's Opinions

Dr. Stairs and Dr. Britt are the claimant's treating physicians at University Health-Shreveport.  On July 21, 2017, Dr. Stairs, writing on behalf of Dr. Britt, explained that the claimant "is currently undergoing treatment for his right knee pain."[69]  She opined that the claimant "should be considered disabled due to his current level of pain and limitations in function."[70]  She also said that "at this time he is not functionally able to work."[71]  She supported that opinion with reference to medical evidence including swelling, severe medial joint line tenderness, and x-rays showing progression of degenerative changes consistent with arthroscopic findings, but she did not identify or describe the functional limitations resulting from the condition of the claimant's right knee.  She did not mention his left knee at all.

---

[69]    Rec. Doc. 7-3 at 93.

[70]    Rec. Doc. 7-3 at 93.

[71]    Rec. Doc. 7-3 at 93.

The Social Security regulations and rulings explain how medical opinions are to be weighed.[72] The ALJ must evaluate all of the evidence in the case and determine the extent to which medical source opinions are supported by the record. Ordinarily, a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with. . . other substantial evidence."[73] While the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion,[74] the ALJ cannot reject a medical opinion without an explanation supported by good cause.[75] However, the ALJ has sole responsibility for determining the claimant's disability status.[76] Although a treating physician's opinions are not determinative, the opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be accorded great weight by the ALJ in determining disability.[77] In fact, when a treating physician's opinion regarding the nature and severity of an

---

[72] 20 C.F.R. § 404.1527(c), § 416.927(c), SSR 96-2p, SSR 96-5p.

[73] 20 C.F.R. § 404.1527(d)(2).

[74] *Martinez v. Chater*, 64 F.3d at 176.

[75] See *Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000) (citations omitted).

[76] *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).

[77] *Pineda v. Astrue*, 289 Fed. App'x 710, 712-713 (5th Cir. 2008), citing *Newton v. Apfel*, 209 F.3d at 455.

impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give that opinion controlling weight.[78]  If an ALJ declines to give controlling weight to a treating doctor's opinion, he may give the opinion little or no weight – but only after showing good cause for doing so.[79]  Good cause may be shown if the treating physician's opinion is conclusory, unsupported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence.[80]

In this case, the ALJ gave little weight to the opinions of the claimant's treating physicians on the basis that they are "conclusory and not within the scope of what a physician decides, as the ability to work is an issue reserved to the Commissioner."[81]   The claimant argued that the ALJ erred in failing to give controlling weight to the treating physicians' opinions.

This Court agrees that the opinions set forth in Dr. Stairs's letter of July 21, 2017 are conclusory.  While Dr. Stairs stated that the condition of the claimant's right knee negatively impacted his functionality, she did not explain the basis for

---

[78]     20 C.F.R. § 404.1527(c)(2).  See, also, *Loza v. Apfel*, 219 F.3d at 393.

[79]     *Thibodeaux v. Astrue*, 324 Fed. App'x 440, 443-44 (5th Cir. 2009).

[80]     *Thibodeaux v. Astrue*, 324 Fed. App'x at 443-44.

[81]     Rec. Doc. 7-1 at 32-33.

that conclusion. She did not provide opinions regarding how long the claimant is capable of sitting, standing, or walking. She did not provide opinions regarding whether the pain caused by the claimant's knee condition or the medications he takes for pain affect his ability to focus or concentrate. She did not opine that the claimant's knee pain is sufficiently severe to qualify as disabling.[82] She did not provide opinions regarding whether the claimant's use of assistive devices to aid in ambulation affects the use of his arms or hands or how much weight he can lift or carry. She did not provide opinions regarding whether the claimant is limited in his ability to stoop, kneel, crouch, or crawl. A doctor's opinion on the ultimate question of whether a claimant is disabled is not entitled to any weight at all;[83] instead, whether a claimant is disabled is a determination reserved to the Commissioner.[84] Therefore, this Court finds that the Commissioner did not err in failing to give the opinions of Dr. Stairs and Dr. Britt controlling weight.

---

[82]    For purposes of Social Security disability evaluations, pain is a disabling condition only when it is constant, unremitting, and wholly unresponsive to therapeutic treatment. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2000).

[83]    *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (physician's opinion that a claimant is "disabled" or "unable to work" is not the type of doctor's opinion that is ever given "special significance" because it is legal conclusion reserved to the Commissioner).

[84]    20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

## G.    The ALJ's Evaluation of the Claimant's Residual Functional Capacity

A residual functional capacity assessment "is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record."[85]    The ALJ is responsible for determining a claimant's residual functional capacity.[86]  In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations.[87]  The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled.[88]  In making a residual functional capacity assessment, an ALJ must consider all symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  The ALJ must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not severe.[89]

---

[85]    *Perez v. Barnhart*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)).

[86]    *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

[87]    *Martinez v. Chater*, 64 F.3d at 176.

[88]    *Chambliss v. Massanari*, 269 F.3d at 522; *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983).

[89]    *Giles v. Astrue*, 433 Fed. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. § 404.1545).

In this case, the ALJ found that the claimant has the residual functional capacity to perform the full range of sedentary work with no limitations.[90] In reaching this conclusion, the ALJ gave partial weight to the opinions of Dr. Yondell Moore, who evaluated the claimant's application for benefits and concluded, on August 8, 2015, that the claimant was capable of performing a limited range of sedentary work including the following postural limitations: occasional climbing of ramps and stairs; never climbing ladders, ropes, and scaffolds; occasional balancing; frequent stooping; occasional kneeling, occasional crouching, and never crawling.[91] The ALJ explained that he gave only partial weight to Dr. Moore's residual functional capacity evaluation because "evidence received at the hearing level demonstrates greater physical limitations"[92] than those recognized by Dr. Moore. That statement is not consistent with the ALJ's finding that the claimant has the residual functional capacity to perform the full range of sedentary work. The ALJ's statement that he found the claimant to have greater physical limitations than those identified by Dr. Moore would require the ALJ to impose more restrictions than Dr. Moore did – not fewer. Accordingly, this Court finds that the ALJ's residual

---

[90]    Rec. Doc. 7-1 at 30.

[91]    Rec. Doc. 7-1 at 93-94, 104-105.

[92]    Rec. Doc. 7-1 at 32.

functional capacity determination is not supported by substantial evidence in the record and was not reached by applying controlling law.

## H.  **Can the Claimant Ambulate Effectively?**

Although the claimant did not allege in his briefing that his knee impairments satisfy a listing, this Court is compelled to raise that issue on its own.[93]  The ALJ concluded that the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  More particularly, he reviewed the criteria of Listing 1.02(A) and found that the claimant did not meet these criteria because he was not unable to ambulate effectively.

Listing 1.02A involves "major dysfunction of a joint(s). . . characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate

---

[93]     See, e.g., *Watson as Next Friend of N.L.K. v. Commissioner of Social Security*, No. 1:17cv00099-JMV, 2018 WL 4689459, at *2-3 (N.D. Miss. Sept. 28, 2018); *Benson v. Commissioner of the Social Sec. Admin.*, 2004 WL 3237348, at *3 (E.D. Tex. 2004); *Womack v. Astrue*, No. CIV-01-167-W, 2008 WL 2486524, at *5 (W.D. Okla. June 19, 2008) ("this Court cannot. . . ignore obvious and prejudicial errors, even if the litigants did not identify and debate them.").  The Fifth Circuit has stated that a "reviewing court may not abdicate its traditional judicial function, nor escape its duty to scrutinize the record as a whole to determine whether the conclusions reached are reasonable, and whether the hearing examiner applied correct legal standards to the evidence." *Bridges v. Gardner*, 368 F.2d 86, 90 (5th Cir. 1966) (citations omitted). Furthermore, the United States Supreme Court has held that a claimant need not exhaust issues in a request for review to the Appeals Council in order to preserve his right to judicial review of those issues.  *Sims v. Apfel*, 530 U.S. 103, 112 (2000).

medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)" with involvement of a major weight-bearing joint such as a knee, resulting in an inability to ambulate effectively.[94] The Social Security regulations define the ability to ambulate effectively as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities."[95] Some examples of ineffective ambulation include "the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail."[96] Conversely, "individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living" in order to be considered able to ambulate effectively.[97]

In reviewing the record evidence germane to this issue, the ALJ expressly mentioned three occasions on which the claimant was using crutches on three

---

[94]     20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02(A).

[95]     20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00(B)(2)(b)(1).

[96]     20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00(B)(2)(b)(2).

[97]     20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00(B)(2)(b)(2).

separate dates in 2014 and 2015, and 2016. It is undisputed that, on those particular occasions, the claimant was unable to ambulate effectively. The ALJ also noted that the claimant was mowing his lawn on August 3, 2015 and cited a treatment note from July 28, 2016 indicating that the claimant normally walks without assistive devices but with a limp and has a cane and crutches that he can use if needed. The ALJ did not mention that the claimant's attempt to mow his yard in August 2015 resulted in a knee injury, an inability to bear weight on his right leg, and the use of a hinged knee brace. The ALJ did not mention that, on March 24, 2017, the treatment note from University Health-Shreveport stated that the claimant "normally walks with assistive devices."[98] The ALJ cited only a single instance in which the claimant used knee immobilizers and did not mention the claimant's use of knee braces or knee sleeves. The ALJ did not evaluate how the use of such devices might impact the claimant's ability to walk effectively. The ALJ also failed to mention, in evaluating the claimant's ambulation, the numerous references in the record to the claimant's knees having buckled or given out, causing him to fall down.

This Court therefore finds that the ALJ's finding that the claimant did not meet the criteria of Listing 1.02 is not supported by substantial evidence in the record.

---

[98] Rec. Doc. 7-3 at 77.

## Conclusion and Recommendation

For the foregoing reasons, the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to again evaluate the claimant's residual functional capacity and again evaluate whether the claimant's knee impairments satisfy the criteria of Listing 1.02. The claimant shall be permitted to submit updated medical information and testify at another hearing, if so desired. Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[99]

Signed at Lafayette, Louisiana, this 15th day of August 2019.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[99] See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).